IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY *CG* ___ D.C.

05 NOV 17 AM 11: 29

THOMAS M. GOULD
CLERK, US DISTRICT COURT
W/D OF TN, MEMPHIS

PEGGY WELSHANS WILLIAMSON and
VANESSA WELSHANS,

      Plaintiffs,

v.                                                              No. 04-2851 B

AETNA LIFE INSURANCE CO.,

      Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

Before the Court is the motion of the Defendant, Aetna Life Insurance Co. ("Aetna"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs, Peggy Williamson and Vanessa Welshans, originally brought this action for common law breach of contract, and violation of the Tennessee Consumer Protection Act, codified at Tennessee Code Annotated § 47-18-104 et seq., and the Tennessee "bad faith statute," codified at Tennessee Code Annotated § 56-7-105, in the Circuit Court of Shelby County, Tennessee. Specifically, Plaintiffs allege that Aetna wrongfully denied health insurance benefits for Williamson's daughter, Welshans, under an employee health plan provided to Williamson by her employer, General Agencies of the United Methodist Church ("General Agencies") and administered by the Defendant. On October 22, 2004, the Defendant removed the matter to this Court with jurisdiction predicated on diversity of citizenship under 28 U.S.C. § 1332. In the instant motion, Aetna seeks summary judgment as to all claims. For the reasons stated below, Defendant's motion is GRANTED.

This document entered on the docket sheet in compliance with Rule 58 and/or 79(a) FRCP on 11-17-05

32

## BACKGROUND AND PROCEDURAL HISTORY

The following facts are undisputed unless otherwise noted. Plaintiff Peggy Welshans Williamson was employed by General Agencies from 1977 until she retired in 1995.[1] (Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") Ex. G, Dep. Peggy Welshans Williamson ("Williamson Dep.") at 23, 25.) As an employee, Williamson was covered by General Agencies' group health insurance plan and, as part of her retirement, she continued to be eligible for the benefits in place at the time she retired. (Id. at 42.) Williamson was a member of a task force at General Agencies that designed the employer's insurance plan and recommended that the Defendant be selected as the plan administrator. (Id. at 43-49.) Based on this recommendation, General Agencies' contracted with Aetna to administer its group health plan ("Plan") from January 1, 1995 through December 31, 2000.[2] (Amend. Compl. ¶ 10.)

Plaintiff Vanessa Welshans is Williamson's daughter. (Amend. Compl. ¶ 5.) Prior to 1986, Welshans was eligible for coverage under General Agencies' health insurance plan as a dependent child of her mother. (Amend. Compl. ¶ 24.) In May 1983, when Weshans was twenty-two years old, she was involved in a car wreck in which she sustained broken legs, a broken pelvis and a broken back. (Williamson Dep. at 40.) According to the Plaintiffs, as a result of the wreck, Welshans suffers from a lower extremity problem which impedes her ability to sit, stand, walk, climb stairs, or do any bending or squatting for a sustained period of time. (Pl.'s Resp. Ex. C at 2.) In 1986, after reaching the maximum age for coverage as a dependent child of Williamson, Welshans was provided

---

[1] Williamson continued working for General Agencies as a consultant following her retirement until the end of 1996. (Pl.'s Resp. Def.'s Mot. Summ. J. ("Pl.'s Resp.") Ex. G, Dep. Peggy Welshans Williamson ("Williamson Dep.") at 25.)

[2] Prior to January 1, 1995 Cigna administered General Agencies' group health plan. (Amend. Compl. ¶ 10.)

continued coverage by Cigna, the prior administrator of General Agencies' health plan, as a "fully handicapped dependent" because of the injuries she sustained in the accident. (Amend. Compl. ¶ 18.) Welshans received coverage as a handicapped dependent from 1986 through 1995 under the terms of the plan with Cigna. (Id. at ¶ 19.)

While Welshans has not been employed since the accident, she has been a full-time student since 1994. (Pl.'s Resp. Ex. G, Dep. Vanessa Claire Welshans ("Welshans Dep.") at 19-21, 37.) In 1994, Welshans attended East Arkansas Community College in Wynne, Arkansas. In 1995, she transferred to Lambuth University in Jackson, Tennessee. (Id. at 19-20)  After graduating from Lambuth University in 1997 with an undergraduate degree in history and sociology, Welshans enrolled at the University of Memphis in Memphis, Tennessee. (Id. at 20.) She earned a masters degree in American history from the University of Memphis in 2000 and has since continued her studies toward a doctorate degree in American History and Modern Europe. (Id. at 20.)  At the time of her deposition in December 2002, Welshans expected to complete the doctoral program in 2004. (Id. at 21.)

Despite her injuries, Welshans is physically and mentally able to care for herself. (Pl.'s Resp. Ex. C at 2 and Welshans Dep. at 9-14.)  She lived independently in Wynne, Arkansas while attending East Arkansas Community College from 1994 through 1995. (Id. at 14.) While attending Lambuth University from 1995-1998, Welshans occasionally lived with her mother. (Id. at 11-13.) Since 1998, she has lived alone in the Memphis and Collierville, Tennessee area. (Id. at 9-10.)

Welshans only source of income is the approximately $500 per month she has received in

3

Social Security Disability payments since 1984.[3] (Welshans Dep. at 42.) Welshans transfers money from Williamson's bank account to her own account each month as needed to meet her living expenses including, rent, bills, and food. (Welshans Dep. at 45-46.)

Williamson and Welshans participated in the indemnity provisions of General Agencies' group health plan during the time in which Aetna served as the administrator. (Def.'s Mot. Ex. 4 Decl. Denise Paradis ("Paradis Decl.") ¶ 6.) Pursuant to these provisions, the insured was responsible for submission of claims to Aetna. (Def.'s Mot. Ex. 5 ("Plan Booklet") at 26.) After the insured satisfied a $250 calendar year deductible, Aetna was responsible for reimbursement of eighty percent of the "reasonable and customary costs (R&C) of most covered expenses." (Plan Booklet at 26.) The insured was responsible for payment of the remaining twenty percent of the R&C costs and any other non-covered expenses, such as those exceeding the R&C limits or for services excluded from the Plan's coverage. (Id.) If the insured's "out of pocket" expenses, excluding the deductible, exceeded $1,500 in a calendar year, Aetna would reimburse one-hundred percent of R&C costs of covered expenses. (Id.) The Plan listed services and products that were excluded from coverage. (Def.'s Mot. Ex. 4B ("Summary Plan Description") at 19-22 and Plan Booklet at 35-37.)

In January 1995, when Aetna began administering General Agencies' health plan, Welshans was thirty-four years of age. (Welshans Dep. at 9.) It is undisputed that, because of her age, Welshans was ineligible for coverage as a dependent child of Williamson during the time at issue in this action. (Welshans Dep. at 9.) However, the Plan provided that "Health Insurance Coverage for [the insured's] fully handicapped dependent may be continued past the

---

[3] Welshans also receives income as a joint owner of a farm. At the time of her deposition, all farm proceeds were directed to the payment of the mortgage on the farm. As such, Welshans did not receive any disposable income as a result of her ownership. (Welshans Dep. at 42-44.)

maximum age for a dependent child, if he or she has not been issued a personal medical conversion policy." (Summary Plan Description at 29.) A person is qualified as a fully handicapped dependent if he or she "is not able to earn his or her own living because of mental retardation or physical handicap which started prior to the date he or she reaches the maximum age for dependents; and he or she chiefly depends on [the insured] or another care provider for support." (Id.) Dependence on another care provider is defined as requiring a "Community Integrated Living Arrangement, group home supervised apartment or other residential services licensed or certified by the Department of Mental Health and Developmental Disabilities, the Department of Public Health or the Department of Public Aid." (Id.) According to the Plan, once established, coverage for a fully handicapped dependent will continue until any one of the following occurrences: (1) "cessation of the handicap and dependency;" (2) "[t]he end of a sixty day period from the date Aetna requests proof of the continuation of the handicap and dependency, if proof is not provided within the 60 day period;" or (3) "Termination of Dependent Coverage as to [the insured's] dependent for any reason other than reaching the maximum age." (Id.) The Plan further provides that Aetna "may request proof of the continuation of the handicap as often as it may reasonably require, but not before two months prior to the dependent reaching the maximum age." (Id.)

When it took over administration of General Agencies' health plan in 1995, Aetna initially rejected medical claims submitted by Welshans and other children of insureds, whom Cigna had previously provided coverage as handicapped dependents, because of a computer error. (Williamson Dep. at 113-116; Def.'s Mot. Ex. 1 at 58; Pl.'s Mot. Ex. I, Dep. Deborah Dee Spencer ("Spencer Dep.") at 33-35.) In response to the problem, Aetna instituted a policy by

which it would "cover all incapacitated dependents without question" for the calendar year 1995.

(Pl.'s Resp. Ex. E at 1547.)  However, Aetna expected to "return to normal procedures to

determine whether an incapacitated dependent is eligible to remain on the [General Agencies]

plan" by January 1, 1996, at which time, dependents could be terminated if they did not meet the

Plan's criteria for eligibility.  (Id.) Consistent with this policy, Welshans was provided coverage

as a handicapped dependent of Williamson in 1995 without an eligibility determination.[4]

(Spencer Dep. at 48-49 and Williamson Dep. at 116.)

On July 26,1996, Aetna first denied Welshans coverage as a handicapped dependent.

(Pl.'s Resp. Ex. A at 1.)  Based on a review of materials submitted by Williamson, Aetna

determined that she was "not handicapped as described in the plan because the physical

limitations described do not seem to be of a severity to preclude full time employment."  (Id.)

Williamson sent a second request for continuation of coverage in August 1996 along with a

statement from Welshans' doctor, Dr. Thomas Limbird, describing her injuries in detail and

opining that she was unable to maintain employment.  (Pl.'s Resp. Ex. C and Ex. E at 1098-

1102.)  Aetna requested additional information regarding Welshans' dependency and marital

status from Williamson in a letter dated September 14, 1996.  (Pl.'s Resp. Ex. E at 1149-50.)  It

is unclear from the record whether subsequent determinations were made as to Welshan's

eligibility in 1996, 1997 or 1998, or whether a settlement or other agreement was entered into by

Aetna and the Plaintiffs through which Aetna agreed to provide coverage as a handicapped

---

[4] Plaintiffs do not dispute whether Welshans was provided coverage as a handicapped dependent
in 1995.  However, the non-payment of some individual claims alleged by Defendant to have been made
on bases other than Welshans' status as a handicapped dependent during 1995 are disputed.(Pl.'s Resp.
Def.'s Facts ¶ 12 and Williamson Dep. at 116-117.)

dependent.[5]  Regardless of the method, Welshans was provided coverage under General

Agencies' health plan  during those years as demonstrated by the Explanations of Benefits

("EOB's") issued by Aetna regarding claims submitted by Plaintiffs for the period in question.[6]

(Def.'s Mot. Ex. 7 and Pl.'s Resp. Ex. E.)  On October 8, 1999, Aetna requested verification of

Welshans' status as a handicapped dependent. (Williamson Dep. Ex. 5.)  On November 8, 1999,

Aetna directed a second request to Williamson for incapacitated child information.  (Id. at Ex. 7.)

It is unclear from the record whether Plaintiffs responded to these requests.[7]  However, the

parties do not dispute that Aetna terminated  Welshans' coverage in 1999.  (Pl.'s Ex. E at 1163.)

_____

[5]  Plaintiffs allege that Aetna agreed to pay all claims from 1996 though 1998 as part of a settlement of a lawsuit brought by Plaintiffs against Aetna in 1996. (Amend. Compl. ¶ 38 and Pl.'s Resp. Def.'s Facts ¶ 37-40.) Defendant neither admits nor denies the existence of such an agreement, but notes correctly that Plaintiffs have not provided any documentary evidence in support of their allegations. (Def.'s Resp. Pl.'s Resp. Def.'s Facts ¶ 40.)

Deposition testimony by Deborah Spencer indicates that Aetna did make determinations of eligibility regarding Welshans in 1996 and 1997, but does not definitively state whether these determinations were made pursuant to an agreement with Plaintiffs or based solely on a determination by Aetna. (Spencer Dep. at 49, 58-59.)  The Court notes a letter dated December 4, 1997 through which Aetna notified Williamson that, based on the information she recently submitted, Welshans would be provided coverage.  (Spencer Dep. Ex. 4.) Spencer indicated that no determination was made in 1998. (Id. at 83.) The Court is aware of no documentary evidence of a review procedure or notice to Plaintiffs regarding eligibility determinations in the record for the period of 1996-1998, other than the letter dated December 4, 1997.

[6]  Plaintiffs do not dispute that Welshans was retroactively provided coverage under General Agencies' health plan in 1998 for claims submitted from 1996 through 1998.  However, the handling of some individual claims on bases other than Welshans' status as a handicapped dependent during this period are disputed.(Amend. Compl. Ex. 4.)

[7]  Defendant Aetna claims that Williamson did not respond to these requests for information. (Def.'s Mot. ¶ 14 and Spencer Dep. at 84.)  In support, Aetna offers the deposition testimony of Deborah Spencer, an Aetna employee during the time at issue in this action, as well as internal documents from Aetna noting the non-receipt of the requested information.

Williamson, while unable to recall the specific date or produce copies, alleges that, in general, she responded to all requests for information by Aetna. (Williamson Dep. at 92-96.) However, Plaintiffs have not offered any evidence to support the applicability of this general statement to the specific request at issue.  Rather, Plaintiffs allege in their response to Defendant's Facts, that a response was not required because Aetna already had in its possession sufficient information from which to make a determination. (Pl.'s Resp. Def.'s Facts ¶ 14.)

On January 22, 1999, Plaintiffs filed separate complaints in the United States District Court for the Middle District of Tennessee to recover damages for breach of contract, and violations of both the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-104, and the Tennessee "bad faith" statute, Tenn. Code Ann. § 56-7-105, as a result of Defendant's alleged failure to pay Welshans's medical claims.[8]   On September 22, 2003, during a bench trial, Plaintiffs voluntarily non-suited their case and the court entered an order dismissing the action without prejudice.  Subsequently, on September 15, 2004, Plaintiffs filed the instant complaint in the Circuit Court of Shelby County, Tennessee which was amended with a filing on September 20, 2004.  The Defendant removed the action to this Court based on diversity of citizenship.

## STANDARD OF REVIEW

Rule 56(c) provides that a

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a

---

[8] Williamson and Welshans' complaints were consolidated by the state court on March 13, 2000.

8

genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. at 2553.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, 106 S.Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Id.</u> at 247-48, 106 S.Ct. at 2510 (emphasis in original).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322, 106 S.Ct. at 2552.  In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." <u>Lord v. Saratoga Capital, Inc.</u>, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1478 (6th Cir. 1989)).  "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).  Finally, the "judge may not make credibility determinations or weigh the evidence." <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

### I.  Tennessee Consumer Protection Act

The Tennessee Consumer Protection Act ("TCPA") provides consumers with a private right of action for any "[u]nfair or deceptive acts or practices affecting the conduct of any trade or

9

commerce." Tenn.Code Ann. §§ 47-18-104(a) & -109(a)(1); see also Menuskin v. Williams, 145 F.3d 755, at 767 (6th Cir. 1998). "The main purpose of the Act is to protect consumers, and it must be liberally construed to affect that purpose." Gaston v. Tennessee Farmers Mut. Ins. Co., 120 S.W.3d 815, 822 (Tenn. 2003). Included in the statute is a non-exhaustive list of thirty-two specific unfair or deceptive acts or practices which are prohibited, as well as a catch-all provision proscribing "[e]ngaging in any other act which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27). While not included in the specific list, the Tennessee courts have concluded that the acts and practices of insurance companies are within the scope of the TCPA. Myint v. Allstate Ins. Co., 970 S.W.2d 920, 925-26 (Tenn. 1998) (holding that the TCPA applies to the initial issuance of an insurance policy); Newman v. Allstate Ins. Co., 42 S.W.3d 920, 924 (Tenn. Ct. App. 2000) (citing Myint when applying the TCPA to an insurance coverage dispute arising after the issuance of the policy); see also Sparks v. Allstate Ins. Co., 98 F.Supp. 2d 933, 937 (W.D. Tenn. 2000) (relying on Myint to hold that the TCPA applies to claims handling procedures of insurance companies).

"In order to recover under the TCPA, the Plaintiff[s] must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA; and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated....'" Tucker v. Sierra Builders, No. M2003-02372-COA-R3-CV, 2005 WL 1021675, *4 (Tenn. Ct. App. April 29, 2005) (quoting Tenn.Code Ann. § 47-18-109(a)(1)). "The defendant's conduct need not be willful or even knowing, but if it is, the TCPA permits the trial court to award treble damages." Id.

The Defendant argues that Plaintiffs' claim under the TCPA must fail because they have not shown that Aetna has engaged in any deceptive or unfair act nor that they have suffered an ascertainable loss of money.  (Def.'s Mot. at 8.)  Rather than alleging unfair or deceptive acts, Aetna asserts that Plaintiffs merely contest the correctness of claim processing decisions and have offered no evidence to demonstrate that any claims were processed in a manner inconsistent with the terms of the Plan.  (Id. at 9.)  In response, Plaintiffs argue that in the handling of Welshans' claims,

> Aetna's conflicting, sequential reasons for denials, refusal to apply the plain language of the Plan, disregard for uncontroverted medical evidence in its files, continuously shifting explanations for why claims were not paid, refusal to pay the claims listed in Exhibit 4, and ultimate return to its original determination that Welshans was somehow not "handicapped dependent" as that term is defined in the Plan, were deceptive . . and otherwise unfair.

(Amend. Compl. ¶ 59.)  Specifically, Plaintiffs maintain that Aetna acted deceptively and unfairly in violation of the TCPA by misrepresenting the terms of the Plan and denying claims without investigation.  (Id. ¶¶ 60, 61.)  As a result of Defendant's actions, Plaintiffs alleged that they have suffered damages in the amount of $74,999.  (Id. ¶ 63.)

In support of their claims, Plaintiffs rely on evidence of multiple requests from Aetna for verification of Welshans' status as a fully handicapped dependent.  In addition, Plaintiffs offer a non-exhaustive list of more than 180 claims alleged to have been filed with Aetna and wrongfully denied spanning a time period of March 7, 1995 through December 31, 2000. (Amend. Compl. Ex. 4.)  Plaintiffs have made no effort to inform the Court of the basis for their allegation that any one of the listed decisions by Aetna was unfair or deceptive.   Upon review of Plaintiffs' list of wrongfully denied claims, the Court notes that many of the listed claims reflect

a reimbursement by Aetna. (see e.g. Amend. Compl. Ex. 4, claim dated March 22, 1995 reflects a charge of $25 of which Aetna reimbursed $20.) With the exception of the name of the provider and the date and amount of the claim, Plaintiffs offer no other information or explanation from which this Court can infer deception or unfairness.[9] While Plaintiffs have included with their response to Defendant's motion EOB's for many of the listed claims, they have not provided any argument as to how the explanation of Aetna's response to submitted claims amounts to a departure from the Plan, much less any misrepresentation, or any other unfairness or deception. See Bookman v. Shubzda, 945 F. Supp. 999, 1004 (N.D. Tex. 1996) (noting that a district court does not have a duty "to survey the entire record in search of evidence to support the non-movant's opposition.").

The only denials which Plaintiff allege were wrongful with some specificity are those based on Welshan's eligibility for coverage as a handicapped dependent. "Erroneous denial of a claim, however, unaccompanied by deceit or other misleading conduct, does not constitute deception or unfairness." Hamer v. Harris, No. M2002-00220-COA-R3-CV, 2002 WL 31469213, *1(Tenn. Ct. App. Feb. 18, 2002) (citing Myint). In Myint v. Allstate Ins. Co., the Tennessee Supreme Court considered application of the TCPA to a suit against Allstate Insurance Company based upon a denial of coverage under a property insurance policy. Myint, 970 S.W.2d at 924-26. Despite the fact that a jury determined that Allstate was liable for coverage under the applicable policy, the court affirmed summary dismissal of the TCPA claim,

---

[9] The list does not provide information relevant to such an inference such as (1) when the claim was submitted to Aetna; (2) what services or products the claim was submitted in regard to; (3) whether the service or product was eligible for coverage as represented by Aetna in the Plan; (4) the R&C cost for such service or product as represented by Aetna in the Plan; and (5) the response, if any, from the Defendant in regard to the submission, including, the reason provided for the response.

noting that, "the record reveals no evidence of an attempt by Allstate to violate the terms of the policy, deceive the Myints about the terms of the policy, or otherwise act unfairly.  It is apparent that the denial of the Myints' claim was Allstate's *reaction to circumstances which Allstate believed to be suspicious.*  Consequently, Allstate's conduct does not fall within the purview of the Tennessee Consumer Protection Act[.]"  Id. at 926 (emphasis added).

In the instant case, it is undisputed that the Plan provides Aetna with the right to request proof of the continuation of Welshans' handicap "as often as it may reasonably require." (Summary Plan Description at 29.)  Further, it is clear from the facts that, whether or not Welshans' physical condition changed, her living conditions and lifestyle did change significantly during the time Aetna administered General Agencies' health plan.  Specifically, in 1994, Welshans enrolled in a full time education program which continued through the term of Aetna's administration.  Further, Welshans, who had previously lived with Williamson, began living independently, often in different cities than her mother.  From these facts alone, it is reasonable for Aetna to have suspected that Welshans' status as a fully handicapped dependent incapable of making a living for herself may have changed.  Whether or not this conclusion was correct, the circumstances surrounding Welshans' dependency provided a good faith basis for inquiry and the clear terms of the Plan entitled Aetna to do so.  See Ginn v. American Heritage Life Ins. Co., 2004 WL 3008801, *11(Tenn. Ct. App. 2004) (finding no evidence to support a verdict under the TCPA where the "only reason [the defendant] claimed plaintiff was not entitled to the [life insurance policy] proceeds was its good faith belief, albeit mistaken, that Plaintiff materially misrepresented her husband's health"); see also Hamer, 2002 WL 31469213 at *2 (finding no violation of the TCPA where defendant refused to perform repairs because he

13

determined it was not his responsibility under the terms of the contract even though that determination was later adjudged erroneous).  As Plaintiffs have failed to present evidence sufficient to establish that Defendant engaged in deceptive or unfair acts, the Court GRANTS the Defendant's motion for summary judgment on Plaintiffs' TCPA claim.

### II.  Tennessee "bad faith" Statute

The Tennessee "bad faith" statute provides that insurance companies

> in all cases in which a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy . . . on which the loss occurred, shall be liable to pay the holder of the policy . . ., in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the *refusal to pay the loss was not in good faith,* and that such failure to pay inflicted additional expense, loss, or injury, including attorneys fees upon the holder of the policy . . .

Tenn. Code Ann. § 56-7-105 (emphasis added).  The statute is penal in nature and must be strictly construed. Niagra Fire Ins. Co. v. Bryan & Hewgley, 195 F.2d 154, 156 (6th Cir. 1952). In order to establish a claim under the statute, Plaintiffs must demonstrate (1) that the insurance policy, by its terms, became due and payable; (2) that a formal demand for payment was made; (3) that Plaintiffs waited sixty days after making demand before filing suit; and (4) that Aetna's refusal to pay was not in good faith.  Palmer v. Nationwide Mut. Fire Ins. Co., 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986).  The insured bears the burden of proving bad faith on the part of the insurer in denying payment.  Id.  "A penalty is not appropriate when the insurer's refusal to pay rests on legitimate and substantial legal grounds." Tyber v. Great Central Ins. Co., 572 F.2d 562, 564 (6th Cir. 1978).

14

Defendant bases its motion for summary judgment on the fourth prong, namely that Plaintiffs' have failed to offer any evidence of bad faith by Aetna.  Plaintiffs assert that Aetna refused without good faith justification to pay any of the claims listed in Exhibit 4 to their complaint.  (Amend. Compl. ¶ 69.)  Aetna contends in response, however, that all refusals to pay were based upon legitimate grounds for disputing the claims consistent with the Plan.  (Def.'s Mot. at 12.)  In support of it's position, Aetna offers its own list of the claims disputed by Plaintiffs which, unlike Plaintiffs' list, includes the reason specified on the relevant EOB for the action taken on the claim.  (Def.'s Mot. Ex. 8.)  Aetna denied all or part of Plaintiff's claims for reasons such as (1) the services or products were not covered expenses; (2) the charges submitted exceeded the R&C costs allowed under the Plan; (3) the claims were not timely submitted; (4) the deductible was not yet satisfied; (5) the service or product was not medically necessary; or (6) Welshans was not eligible for coverage because she exceeded the allowable age for a dependent and/or was terminated from coverage. (Id. and Pl.'s Resp. Ex. R.) In other cases, Aetna paid eighty percent or one-hundred percent of the claim as submitted. (Id.)  The Court will address the denial of claims on the basis of Welshans eligibility for coverage separately from those on the basis of the provisions of the Plan.

Regarding the denial of claims pursuant to provisions of the Plan unrelated to Welshans' eligibility for coverage, Plaintiffs have failed to set forth any argument to support an inference that the reasons provided by the Defendant for its response to their claims, grounded facially in the express terms of the policy, were not valid.  "The bad faith penalty is not recoverable in every refusal of an insurance company to pay a loss.  An insurance company is entitled to rely upon available defenses and refuse payment if there is substantial legal grounds that the policy does

15

not afford coverage for the alleged loss." <u>Nelms v. Tennessee Farmers Mut. Ins. Co.</u>, 613

S.W.2d 481, 484 (Tenn. Ct. App. 1978). While Plaintiffs may dispute the resolution of the

claims, they have offered no evidence from which this Court can infer bad faith on the part of the

Defendant.

Regarding those claims denied on the basis of Welshans' eligibility in 1999 and 2000,

Defendant maintains that, consistent with its rights under the Plan, coverage for Welshans was

terminated at the end of a sixty day period after which it requested information to verify

Welshans continued eligibility for coverage. (Def.'s Mot. at 13; Pl.'s Resp. Ex. E at 1159-63;

Spencer Dep. at 83-85.) Aetna contends that it never received the requested information, thus,

consistent with the policy, Welshans was terminated. (<u>Id.</u>)

Plaintiffs do not dispute that the Plan permitted Aetna to request information regarding

Welshans condition as reasonably required to determine her continued eligibility for coverage as

a handicapped dependent.  Rather, they maintain that Aetna's requests were unreasonable

because they had previously supplied information which was sufficient to make the

determination and which indicated that Welshans' condition was unlikely to change.[10] (Pl.'s

---

[10] While not relied upon in Plaintiffs' response to the instant motion, the deposition testimony of
Williamson addressed Plaintiffs' response to Aetna's requests:

    Q: . . . Now, you're indicating that every time you received these forms you filled them out and
        sent them back, is that correct?
    A: Yes.
    Q: Okay, did you keep copies of the forms?
    A: I doubt it.  I don't know.  I don't know. . .
        . . . . . .
    Q: Okay. Do you have any recollection of filling out the forms in 1999?
    A: Yes, we filled out forms in 1999, I know we did.
    Q: Okay, do you know when you did that?
    A: No, I just know when we were requested to do that, we did it.
        . . . . . .
    A: No, I am just saying to you that any time we received a request to do some kind of

Resp. Def.'s Facts ¶ 14.) Specifically, Plaintiffs rely on the statement submitted by Dr. Thomas Limbird on August 9, 1996 describing Welshans' medical condition, his prognosis that her condition was unlikely to improve, and his opinion that Welshans was unable to maintain employment. (Pl.'s Resp. Ex. C). Because Aetna already had this information, Plaintiffs maintain that the requests, and subsequent denial of claims, were made in bad faith. (Pl.'s Resp. Def.'s Facts ¶ 13.)

The Court finds Plaintiffs' position to be without merit. The plain language of the Plan permits the inquiry made by Aetna and provides for termination of coverage in the event that the insured does not comply.[11] As noted above, during the period of 1994 through 1999, Welshans began and successfully maintained status as a full time student. In addition, in 1998 she moved from Jackson, Tennessee to Memphis, Tennessee where she lived apart from Williamson. These

_____

action from Aetna, we did it, no matter how insane their request was.

Despite this generalized contention by Williamson, Plaintiffs have pointed to no evidence in the record to counter Defendant's allegation that no response was received. In contrast, the Defendant offers the deposition testimony of Deborah Dee Spencer, an Aetna employee, that no eligibility determination was made in 1999 because Aetna did not receive the requested documentation. (Spencer Dep. at 83-84.) In addition, Defendant offers two letters, dated October 8, 1999 and November 8, 1999, directed to Williamson requesting the information, the latter of which indicates that it is a "second request." (Pl.'s Resp. Ex. E at 1159-63). While she is unable to recall the specific letter, Williamson concedes that the letters were addressed to her then current address. (Williamson Dep. at 90-96.) In addition, Defendant has offered an internal Aetna document dated November 16, 1999 indicating that Ms. Williamson was advised by phone to supply the requested information. (Id. at 1163.) The same document includes an entry dated December 17, 1999 indicating that, because no information was received, Welshans coverage was terminated.

In the face of Defendant's documentary evidence demonstrating that Plaintiffs did not provide the requested information, it is incumbent on the Plaintiffs to bring forth specific facts showing that there is an issue for trial. Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. The Court concludes that the Plaintiffs' generalized statement of compliance is not sufficient to meet this burden.

[11] The Plan provides that coverage of a handicapped dependent will cease upon "[t]he end of a 60 day period from the date Aetna requests *proof of the continuation of the handicap and dependency,* if proof is not provided within the 60 day period." (Summary Plan Description at 29.) (emphasis added)

changed circumstances create a reasonable basis from which Aetna could question whether Welshans continued to be unable to earn her living or chiefly depend on Williamson for support. (Summary Plan Description at 29.); see also Nelms v. Tennessee Farmers Mutual Ins. Co., 613 S.W.2d at 484 (reversing the jury's award of a bad faith penalty after concluding there were "valid reasons for the insurance company to question the loss"). The Court also notes that Limbird's statement was first submitted to Aetna in 1996. While his prognosis was that Welshans condition was unlikely to change, a current medical evaluation after three years is not unreasonable.[12] Further, while Limbird's statement regarding Welshan's physical condition may well have been valid in 1999, it did not speak to Welshans' dependency status. In light of Welshans' changed circumstances and the express language of the Plan, Defendant's request for eligibility information was reasonable. Because Plaintiffs have failed to offer any evidence that they complied with the request as required under the terms of the Plan, the Court finds that Aetna had substantial legal grounds for termination of the policy. As such, Defendant's motion for summary judgment is GRANTED as to Plaintiffs' claim for the "bad faith" penalty.

   III. Breach of Contract

   Under Tennessee law, insurance contracts are to be interpreted in the same way as other types of contracts. Merrimack Mut. Fire Ins. Co. v. Batts, 59 S.W.3d 142, 148 (Tenn. Ct. App. 2001), reh'g of denial of app. den. (Dec. 27, 2001). The language of an insurance policy is to be "given its plain and ordinary meaning." Tennessee Farmers Mut. Ins. Co. v. Tait, No. 99-6578, 2001 WL 1216963, at *2 (6th Cir. Oct. 4, 2001) (per curiam) (applying Tennessee law) (citations

---

   [12] Plaintiffs' have provided no evidence of the submission of any medical evaluation other than that of Dr. Limbird in 1996.

omitted).  The court must read the policy as a layperson would.  <u>Davidson Hotel Co. v. St. Paul</u>

<u>Fire & Marine Ins. Co.</u>, 136 F.Supp.2d 901, 905 (W.D. Tenn. 2001).  "Where there is an

ambiguity or uncertainty with regards to the terms of an insurance policy, the court must interpret

the terms strictly against the drafter of the policy."  <u>Tennessee Farmers Mut. Ins. Co.</u>, 2001 WL

1216963, at *2 (citing <u>NSA DBA Benefit Plan, Inc. v. Connecticut Gen. Life Ins. Co.</u>, 968

S.W.2d 791, 795 (Tenn. Ct. App. 1997)).  If the language of the policy is unambiguous the court

"must interpret it as written."  <u>Public Employees Benefit Servs. Corp. v. Parminter</u>, 60 S.W.3d

833, 837 (Tenn. Ct. App. 2001), <u>app. den.</u> (Sept. 17, 2001) (citation omitted).  The court is not at

liberty to rewrite an insurance contract simply because it does not favor its terms and must not

force constructions that would render provisions ineffective or extend provisions beyond their

intended scope.  <u>Merrimack Mut. Fire Ins. Co.</u>, 59 S.W.3d at 148.

Plaintiffs argue that summary judgment is inappropriate on their breach of contract claim

for a myriad of reasons, the central nexus of which seems to be Aetna's allegedly wrongful

processing of claims between 1995 and 1998, during the period Welshans was provided

coverage, as well as Aetna's denial of claims after her coverage was terminated in 1999.  The

Court will, again, address these issues separately.  The Defendant asserts that it processed

Welshans' claims from 1995 through 1998 in accordance with the terms of the Plan.  In support,

Aetna has offered a list of Welshans' claims during this period along with the action taken by

Aetna and the reason for that action as specified in the EOB.  (Def.'s Mot. Ex. 8.)  Defendant

argues that all explanations offered by Aetna for the actions taken are based in the plain language

of the Plan's provisions and exclusions.  (Def.'s Mot. at 15.)  Plaintiffs have offered no evidence

or argument in response to Aetna's assertions to demonstrate otherwise.  Furthermore, from the

19

of the Plan's provisions and exclusions.  (Def.'s Mot. at 15.)  Plaintiffs have offered no evidence

or argument in response to Aetna's assertions to demonstrate otherwise.  Furthermore, from the

information provided by Plaintiffs, the Court is unable to make any determination regarding the

validity of Aetna's actions under the contract.  Plaintiffs' list of claims provides only the date,

provider name, amount claimed and response by Aetna. (Amend. Compl. Ex. 4.)  Because the

Plaintiffs have not provided any information or argument to the Court regarding the basis for the

claim and how Aetna's action departed from the terms of the Plan, the Court is unable to make

any determination as to whether the claim for the service or product was wrongfully processed.

Where Plaintiffs have not supplied an argument for breach of contract on any of the more than

180 claims listed, the Court will not endeavor to do it for them.  See Skotak v. Tenneco Resins,

Inc., 953 F.2d 909, 916 n. 7 (5th Cir. 1992) ("Rule 56 does not impose upon the district court a

duty to sift through the record in search of evidence to support a party's opposition to summary

judgment . . .  Rule 56 allocates that duty to the opponent of the motion, who is required to point

out the evidence, albeit evidence that is already in the record, that creates an issue of fact.").

    Aetna maintains that the termination of Welshans' coverage and subsequent denial of

claims on that basis was also made pursuant to the plain language of the Plan.  (Def.'s Mot. at

17-18.)  As noted above, the Plan provided Aetna with the authority to request proof of

Welshans' continued handicap and dependency as it may "reasonably require" to make

determinations regarding her eligibility for coverage.  (Summary Plan Description at 29.)  As the

Court has already determined that Aetna's requests for such information in 1999 were reasonable

in light of the circumstances, the only remaining issue is whether Aetna was within its

contractual rights to terminate Welshan's coverage in 1999.  The contract provides Aetna with

20

authority to terminate at "[t]he end of a 60 day period from the date Aetna requests proof of the continuation of the handicap and dependency, if proof is not provided within the 60 day period." The uncontroverted evidence demonstrates that Aetna requested such proof on October 8, 1999. Defendant avers that Plaintiffs failed to respond to the request. Plaintiffs have not directed the Court to any evidence to demonstrate that this fact is in dispute. Accordingly, pursuant to the terms of the contract, Aetna could rightfully terminate Welshans' coverage on December 9, 1999.

Finally, the Court notes that Plaintiffs' response in opposition to summary judgment mentions several other arguments, including Defendant's failure to investigate claims, and "continuous[] reinterpreti[on of] the definition of 'handicapped dependent' in a manner inconsistent with the Plan." Because Plaintiffs have set forth no facts or specific arguments in support of these contentions, the Court finds that they are without merit.

CONCLUSION

Based on the foregoing, this matter is DISMISSED and the Clerk of Court is directed to enter judgment in favor of the Defendant.

**IT IS SO ORDERED** this 16ᵗʰ day of November 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 32 in
case 2:04-CV-02851 was distributed by fax, mail, or direct printing on
November 17, 2005 to the parties listed.

---

Gary Shaun Hair
RIEVES RUBENS & MAYTON
P.O. Box 1359
West Memphis, AR 72303

Herbert E. Gerson
FORD & HARRISON, LLP- Ridge Lake Blvd.
795 Ridge Lake Blvd.
Ste. 300
Memphis, TN 38120

David P. Knox
FORD & HARRISON, LLP- Ridge Lake Blvd.
795 Ridge Lake Blvd.
Ste. 300
Memphis, TN 38120

Jimmy Moore
CIRCUIT COURT, 30TH JUDICIAL DISTRICT
140 Adams Ave.
Rm. 224
Memphis, TN 38103

Lawrence W Jackson
LAW OFFICE OF LAWRENCE W. JACKSON
P. O. Box 1359
West Memphis, AR 72303

Kathleen G. Morris
LAW OFFICES OF KATHLEEN G. MORRIS
P.O. Box 128091
Nashville, TN 37212

Kent J. Rubens
RIEVES RUBENS & MAYTON
P.O. Box 1359
West Memphis, AR 72303--133

Honorable J. Breen
US DISTRICT COURT